*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MARK N. WAYSON, | ) | |
| | ) | Supreme Court No. S-17874 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-17-05729 CI |
| v. | ) | |
| | ) | O P I N I O N |
| WILLIAM E. STEVENSON, | ) | |
| | ) | No. 7614 – August 12, 2022 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances: Mark N. Wayson, pro se, Sutton, Appellant. Taylor B. McMahon, Law Offices of Royce & Brain, Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

BORGHESAN, Justice.

## I.     INTRODUCTION

This appeal arises from a long-running dispute between neighbors over access to the Matanuska Glacier. The dispute concerns an easement that leads from the Glenn Highway over residential property to a parcel of land used as a jumping-off point for a glacier tourism business. After years of disagreement over issues related to road maintenance, traffic, safety, and trespass on the homeowner's property by visitors to the

glacier, the homeowner erected a sign stating "No Glacier Access" near the entrance to the road.

The business owner filed suit, and the homeowner counterclaimed for defamation based on inflammatory allegations made in the complaint. The superior court largely ruled in favor of the business owner. It held that he has a right to use the easement for his glacier tourism business, that his road maintenance work was reasonably necessary and did not unreasonably damage the homeowner's property despite minor increases in the width of the road, and that the "No Glacier Access" sign had unreasonably interfered with his use of the easement. The superior court also dismissed the defamation counterclaims and awarded attorney's fees to the business owner. We affirm the superior court's judgment in full.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

#### 1.    Pre-1977 history of the land

The easement in question begins at the Glenn Highway near the community of Glacier View, proceeds south across a residential property and over the Matanuska River, and leads to a parcel on the south side of the river near the Matanuska Glacier.

The area has historically been home to the Ahtna Athabascan people.[1] In the twentieth century settlers in the area began staking land claims under the authority of various federal programs. Some properties were claimed as homestead sites for

---

[1]    *See* William E. Simeone et al., *The Ahtna Homeland*, 17 ALASKA J. ANTHROPOLOGY 102, 103 (2019). It is unclear when, exactly, the parcels at issue in this case became habitable. The glacier filled the Matanuska Valley during the Wisconsin glaciation and then began a cycle of retreating and advancing near its present terminus sometime prior to 8,000 years ago. *See* John R. Williams & Oscar J. Ferrians, Jr., *Late Wisconsin and Recent History of the Matanuska Glacier, Alaska*, 14:2 ARCTIC 83, 83-90 (1961).

residential occupancy, while others were claimed as trade and manufacturing (T&M) sites for commercial use.

The Kimball family — including John (Jack) and Vernon — moved to the area in 1964 and began making land claims to parcels on both sides of the river. Vernon claimed land on the north side of the river while Jack claimed land on the south side. Jack had both a residential homestead site and a commercial T&M site. On his properties Jack established a lodge, store, and other enterprises promoting tourism at the glacier, including a guided tour business.

Jack and other local residents built Keith's Road, which started at the Glenn Highway, crossed the river, and led to parcels on the south side of the river. The south end of the Keith's Road bridge abutted Jack's T&M site, and Jack charged a fee to pass through his property. The bridge soon washed out, and a new one was built farther downstream, away from Jack's property.

In 1970 Jack built a second road and bridge to provide access to his property. This second road connected Mile 102 of the Glenn Highway to the glacier by crossing Vernon's property, then the river, then Jack's property. Jack cleared the road to the face of the glacier. He charged a fee to use this road for glacier access.

### 2. The 1977 deed of easement

After Jack built the road and bridge, Vernon allowed Jack to cross his property without a written easement. Yet Jack insisted on getting a written easement. In 1977 Vernon executed a deed granting Jack an easement to cross his property.[2] The deed conveyed to

---

[2] Vernon executed a second deed in 1979 granting another Kimball brother an easement to cross his property. Because we resolve the access issues raised in this appeal exclusively on the basis of the 1977 easement, we do not address the 1979 deed.

[Jack,] his successors and assigns forever, a right-of-way and easement with the right, privilege and authority to [Jack], his successors and assigns, to use without restrictions, for purposes of ingress and egress, the road, roadway or means of access to, from and across, presently situated and constructed on . . . Lots Seven (7), Eight (8), Nine (9), and Ten (10) . . . .

It is understood by [Vernon] that execution of this Easement shall entitle [Jack], his successors and assigns forever, to use the existing roadway on the above described property, without restriction, to cross over and gain access to adjacent or adjoining lands as [Jack] may deem necessary or appropriate.

### 3. Arrival of Cook Inlet Region, Inc., Wayson's and Stevenson's acquisitions of the land, and subsequent conflicts

As part of the implementation of the 1971 Alaska Native Claims Settlement Act[3] (ANCSA), the Alaska Native Corporation Cook Inlet Region, Inc. (CIRI) selected land in the area, including portions of the glacier itself, for ownership.

In 1992 William Stevenson began renting Jack's property on the south side of the river. Eight years later Stevenson and Jack entered into a written lease for 552 acres of Jack's property, including the Glacier Park Lodge. Stevenson ran the lodge as well as several other tourism businesses involving the glacier. In 2017 Stevenson (through one of his businesses) signed a long-term lease with CIRI to access CIRI lands for his glacier tours.

Stevenson began to maintain the easement road when he started renting from Jack and has continued to do so. Maintenance activities include fixing potholes and plowing snow, most of which goes over the edge of the road. The road has been

---

[3] 43 U.S.C. §§ 1601-1629h.

involved in three rockslides, which Stevenson cleaned up by bulldozing the fallen rocks off the road.

Between 1989 and 1991 Mark Wayson acquired four of Vernon's lots, including two he purchased directly from Vernon. Wayson's deed from Vernon references the 1977 deed, stating that the lots Wayson purchased were

> FURTHER SUBJECT TO a general easement granted to [Jack] for ingress and egress affecting the portion of the said premises and for the purposes stated therein, and incidental purposes thereto as disclosed by instrument recorded March 21, 1977 . . . .

The easement road bisects Wayson's property; his house and other improvements lie on the north end of the road closest to the Glenn Highway.

Stevenson and Wayson have disputed their property rights for the past two decades. Wayson has expressed concern about the stability of his home's foundation; the safety of the roadway, including rocks falling from the cliff above the road; and the liability he may incur if a traffic accident were to happen. Wayson also objects to the scope of Stevenson's maintenance of the roadway, asserting that Stevenson is impermissibly expanding the roadway surface and pushing waste and debris onto Wayson's property. Wayson eventually posted a "No Glacier Access" sign along the easement road, prompting Stevenson to bring their dispute to court.

### B.    Proceedings

#### 1.    Declaratory and injunctive relief

In March 2017 Stevenson filed a complaint for declaratory relief against Wayson, alleging that Wayson had interfered with Stevenson's use of the easement. Wayson answered; although he did not deny the existence of the easement, he counterclaimed for relief that would restrict Stevenson's use of the easement. In particular, Wayson requested that the court order the easement closed for non-residential

use until Stevenson provided liability coverage for Wayson and took certain safety measures, including installing highway guardrails on both sides of the easement and posting safety-related signage along the road. Wayson also asked the court to order that Stevenson use a different route for his clients to access "any destination across CIRI lands, the Matanuska Glacier, and [any] other non-dominant estate," and to order that Stevenson stop maintaining the easement in ways that brought debris onto Wayson's property or undermined its foundation. Wayson further alleged that Stevenson had "abuse[d]" the easement by "renting out [Wayson's] property" to an automobile company for a vehicle commercial. Finally Wayson counterclaimed for defamation based on an allegation in Stevenson's complaint that Wayson had interfered with the easement by appearing nude or undressed near the easement.

Stevenson moved for a preliminary injunction on several of the disputed issues. After four days of testimony the superior court partially granted the preliminary injunction in July 2017. The court ruled that Stevenson could use the easement road for commercial purposes. The court also ruled that Wayson could post signs that protected his property at the roadway, but not signs saying "No Glacier Access" or something to similar effect. The court reasoned that such a sign would likely interfere with Stevenson's use of the easement, but that Wayson was entitled to warn others of "the road's inherent risks to motorist(s) to limit [Wayson's] liability." Hearing no evidence to support Stevenson's public nudity allegation, however, the court declined to issue a preliminary injunction prohibiting Wayson "from being in any state of undress on his property."

### 2. Defamation claims

The parties engaged in extensive motion practice concerning the allegation in Stevenson's complaint that Wayson had appeared nude or undressed near the easement. The superior court ultimately ruled the allegations in the complaint to be

privileged and dismissed Wayson's defamation counterclaim on summary judgment in May 2019.

Wayson had earlier moved to amend his counterclaim to add a third-party defamation claim against Stevenson's lawyer, Chadwick McGrady. The superior court initially denied leave to amend, but on reconsideration allowed Wayson to file the third-party claim based on statements McGrady made to a newspaper reporter. The defamation case against McGrady, a Colorado resident, was removed to federal court, where it was dismissed under the fair report privilege.[4]

### 3. Superior court's findings of fact and conclusions of law

A trial was held over six days in May and June 2019. The superior court issued findings of fact and conclusions of law in January 2020, amending them in April 2020 after granting Stevenson's motion for reconsideration.

The court ruled that Stevenson could use the easement road for commercial activity: namely, to promote his tourism business and provide access to Matanuska Glacier. However, the court determined that Stevenson's use of the roadway to film a vehicle commercial several years prior was beyond the scope of the easement because it was not incidental to ingress or egress.

The superior court also ruled that the deed of easement did not establish a definite width. Therefore the court reasoned that the easement's width is that reasonably necessary for the enjoyment of the servitude. The court then found that Stevenson's road maintenance — using a road grader to smooth the surface, plowing snow and other

---

[4] *Wayson v. McGrady*, No. 18-CV-00163, 2019 WL 3852492, at *4-7 (D. Alaska June 25, 2019) (holding that McGrady's comments, as "fair 'abstract or abridgment' " of nudity-related material in Stevenson's complaint and not made "solely for the purpose of causing harm to" Wayson, were protected by fair report privilege (quoting *Fairbanks Publ'g Co. v. Francisco*, 390 P.2d 784, 793-96 (Alaska 1964))).

debris off the side of the road, and pushing rocks over the downhill side of the road —
is reasonable and necessary to Stevenson's enjoyment of the easement and that marginal increase in the width of the roadway over time resulting from these maintenance activities does not unreasonably burden or damage Wayson's property. Furthermore, reasoning that "trees and brush are routinely cut back along the edge of a roadway easement," the court concluded that this type of "clearing or incidental damage is consistent with Stevenson's obligation to maintain the roadway."

The superior court further ruled that Stevenson was not trespassing on Wayson's property and that Wayson had interfered with the easement by placing a sign that said "No Glacier Access." The court issued a separate order that same day on Stevenson's request for a permanent injunction, in which it described permissible language that Wayson could put on signage along the easement road.

### 4.   Superior court's order on attorney's fees

In August 2020 the court determined that Stevenson was the prevailing party and awarded him $50,000 in attorney's fees. The court reasoned that the litigation could be broken up into three main categories:   the preliminary injunction, the defamation issue, and issues related to the easement. The court stated that there was "little dispute" that Stevenson prevailed on the preliminary injunction issue. The court then explained that Stevenson prevailed on the defamation issue, which was the focus of much of the motion practice in the case, noting that Wayson prevailed on only one point:   being permitted to file a third-party defamation complaint against McGrady. Finally, the court ruled that although Wayson prevailed on the issue of whether he had interfered with the easement apart from posting a "No Glacier Access" sign, Stevenson prevailed on the other issues related to the easement: Stevenson obtained rulings that the easement allowed his commercial use and road maintenance activities and that those maintenance activities and his use of the road to provide access to the glacier did not

constitute trespass. The court concluded that on the whole, Stevenson prevailed on the majority of issues in the case and "his view of the scope of the easement was upheld."

Wayson appeals.

## III.  STANDARDS OF REVIEW

"We review the superior court's factual findings for clear error, which occurs when a review of the entire record leaves us with a definite and firm conviction that a mistake has been made."[5] "[I]t is the province of the [superior] court to judge witnesses' credibility and weigh conflicting evidence."[6] "We review the superior court's legal conclusions de novo."[7]

When reviewing an award of attorney's fees, we review the superior court's award and prevailing party determination for abuse of discretion.[8] An award of attorney's fees or a prevailing party determination is an abuse of discretion "only when it is manifestly unreasonable."[9]

---

[5]  *Offshore Sys.-Kenai v. State, Dep't of Transp. & Pub. Facilities*, 282 P.3d 348, 354 (Alaska 2012).

[6]  *Estate of Smith v. Spinelli*, 216 P.3d 524, 528 (Alaska 2009) (quoting *Peterson v. Ek*, 93 P.3d 458, 463 (Alaska 2004)).

[7]  *Offshore Sys.-Kenai*, 282 P.3d at 354.

[8]  *Boiko v. Kapolchok*, 426 P.3d 868, 876 (Alaska 2018); *Schultz v. Wells Fargo Bank, N.A.*, 301 P.3d 1237, 1241 (Alaska 2013).

[9]  *Boiko*, 426 P.3d at 876 (quoting *Cizek v. Concerned Citizens of Eagle River Valley, Inc.*, 71 P.3d 845, 848 (Alaska 2003)); *Schultz*, 301 P.3d at 1241 (quoting *All. of Concerned Taxpayers, Inc. v. Kenai Peninsula Borough*, 273 P.3d 1123, 1126 (Alaska 2012)).

## IV.  DISCUSSION

Wayson's arguments on appeal fall into four categories relating to:  (1) the scope of the easement; (2) defamation claims; (3) an asserted federal Clean Water Act claim; and (4) the award of attorney's fees.  We address each category in turn.

### A.  The Superior Court Did Not Make Legal Or Factual Errors In Its Rulings On The Easement.

#### 1.  The 1977 deed of easement allows Stevenson to use the easement for commercial purposes.

The superior court ruled that Stevenson may use the easement to promote his tourism business and provide access to the glacier.  Wayson appears to argue on appeal that the superior court erred by construing the 1977 deed of easement to permit Stevenson's commercial activities.[10]  He contends that this interpretation "expand[s] the scope of the easement," impermissibly allowing Stevenson to use the road for his tourism business.

In Alaska "[t]he touchstone of deed interpretation is the intent of the parties and where possible the intention of the parties will be given effect."[11] We apply a three-step test when interpreting a deed.[12]  We first examine "the four corners of the document to see if it unambiguously presents the parties' intent."[13]  "Whether a deed is ambiguous

---

[10]  Wayson argued in the superior court that although the easement is "open to those who are authorized . . . to use it," Stevenson is not permitted to use the easement "in trespass."

[11]  *Sykes v. Lawless*, 474 P.3d 636, 643-44 (Alaska 2020) (quoting *HP Ltd. P'ship v. Kenai River Airpark, LLC*, 270 P.3d 719, 727 (Alaska 2012)).

[12]  *Id.* at 644.

[13]  *Id.* (quoting *McCarrey v. Kaylor*, 301 P.3d 559, 563 (Alaska 2013)).

is a question of law that we review de novo."[14]  "If the deed is open to only one reasonable interpretation," we end our analysis there.[15]

But if the deed is ambiguous, we will proceed to the second step and "consider[] extrinsic evidence of the surrounding facts and circumstances."[16]  "In this second step, the 'inquiry can be broad, looking at "all of the facts and circumstances of the transaction in which the deed was executed, in connection with the conduct of the parties after its execution." ' "[17] The superior court's factual findings based on its analysis of extrinsic evidence are reviewed for clear error.[18]

Finally, "[i]f the parties' intent is still unclear after examining extrinsic evidence," we will then consider rules of construction in interpreting the deed.[19]

In accordance with this test, we begin by examining the express language of the 1977 deed.  The deed grants Jack and "his successors and assigns forever" the right to "use" the roadway "without restriction, to cross over and gain access to adjacent or adjoining lands as [Jack] may deem necessary or appropriate."  Although the deed does not expressly mention commercial use, its language is certainly broad enough to include it.  The deed's language not only allows use "without restriction," it also incorporates Jack's own judgment about what use is "necessary or appropriate."  This

---

[14]     *Id.* (ellipsis omitted) (quoting *Reeves v. Godspeed Props., LLC*, 426 P.3d 845, 849 (Alaska 2018)).

[15]     *Offshore Sys.-Kenai v. State, Dep't of Transp. & Pub. Facilities*, 282 P.3d 348, 354 (Alaska 2012).

[16]     *Sykes*, 474 P.3d at 644 (quoting *HP Ltd. P'ship*, 270 P.3d at 727).

[17]     *Id.* (quoting *Estate of Smith v. Spinelli*, 216 P.3d 524, 528 (Alaska 2009)).

[18]     *Id.* (quoting *Spinelli*, 270 P.3d at 529).

[19]     *Offshore Sys.-Kenai*, 282 P.3d at 354.

language cannot be reasonably read as limited to non-commercial use. Therefore the deed is not ambiguous.

Even if the deed's language were ambiguous, "the facts and circumstances surrounding the conveyance"[20] leave no doubt that the parties intended the easement to include commercial use. As the superior court observed, the extrinsic evidence is clear that Vernon intended to convey the easement to Jack to use in whatever way he wanted, including for commercial glacier access. Jack had a commercial T&M site at which he ran a lodge, store, and other enterprises promoting tourism at the glacier, and his glacier guiding business was already in existence when Vernon conveyed the easement. These facts support the inference that the easement was intended to be used for commercial purposes, both generally and specifically for the purpose of providing access to the glacier.

Vernon's pre-trial deposition testimony further shows that the scope of the easement extends to commercial use. He testified that the purpose of the easement was to give Jack "access to his property and the use of his business to get people to cross . . . his land to go to the glacier" and "[s]o he could access his property and his business to let anybody go to use his T&M or the glacier or any of that." Vernon also mentioned that there were no limitations on the type of traffic that could use the road nor any limitations on glacier-bound tourism traffic. In other words, the easement "was for Jack [to] use . . . for anything he wanted to." No contrary evidence was presented.

---

[20]    *Id.*

We therefore affirm the superior court's determination that the 1977 deed of easement was intended to allow Stevenson to use the easement for his glacier access business.[21]

### 2. The easement is not void for illegality or as against public policy.

Wayson next argues that Stevenson's use of the easement for commercial glacier access is illegal and violates public policy because his guiding and glacier tourism business may have involved trespassing on CIRI lands.[22] Stevenson and CIRI entered

---

[21] The superior court understood the easement to be in gross; that is, "assigned to a specific person and . . . not run[ning] with the land." *Reeves v. Godspeed Props., LLC*, 426 P.3d 845, 850 (Alaska 2018). The court seemed to believe that if the easement were appurtenant — meaning that it existed "to benefit the dominant estate" and ran with the land — then it could not be used to access other properties. *Id.* In *Reeves v. Godspeed Properties* we recited the rule articulated in section 4.11 of the Restatement (Third) of Property that an easement appurtenant "may not be used for the benefit of property other than the dominant estate." *Id.* (quoting *HP Ltd. P'ship*, 270 P.3d at 730 (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.11 (AM. L. INST. 2000))). Comments to that section of the Restatement indicate that it is a default rule applying absent specific language by the parties and that parties "are free to determine the extent of the use rights conferred on the beneficiary of a servitude." RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.11 cmts. a, b. The 1977 deed allows the grantee to use the easement to "cross over and gain access to adjacent or adjoining lands." As the superior court noted, this broad language permits the easement to be used for access to land beyond contiguous parcels. Because the intent of the parties about the scope of access is clear, it does not matter for purposes of this litigation whether the easement is in gross or appurtenant. As a result, we need not address this question.

[22] The superior court addressed this issue somewhat cursorily, noting that even if Stevenson were trespassing over CIRI lands, this trespass would not be illegal because the law recognizes prescriptive easements. ANCSA exempts from adverse possession "all land and interests in land in Alaska conveyed by the Federal Government pursuant to [ANCSA] to a Native individual or Native Corporation . . . so long as such land and interests are not developed or leased or sold to third parties." 43 U.S.C. § 1636(d)(1)(A). The ownership status of the lands adjacent to the easement at specific
(continued...)

into a lease agreement in 2017 that has extinguished the risk of potential trespass by glacier-bound tourists.

The Restatement (Third) of Property provides that a servitude is "valid unless it is illegal or unconstitutional or violates public policy."[23] "To create a valid servitude, a land owner need only comply with the Statute of Frauds . . . and avoid violating any statute, constitutional provision, or public policy limiting the rights and obligations that can be made to run with the land."[24] The party claiming a servitude is invalid has the burden of showing that the easement is illegal or violates public policy.[25]

"An illegal servitude . . . is one that is prohibited by a statute or governmental regulation."[26] As explained above, the easement Vernon granted Jack authorizes commercial use. There is nothing unlawful about an easement providing access to a commercial tourism business. The fact that the business may not have been operating with the proper permits at all times does not mean that the easement itself is

---

**22** (...continued)
points in time is unclear from the record, and we cannot determine whether prescriptive easements to cross them could have been established. But because we conclude that the possibility of trespass on CIRI lands does not make the 1977 easement unlawful, it is unnecessary to address this issue.

**23** RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 3.1.

**24** *Id.* cmt. a.

**25** *Id.*

**26** *Id.* cmt. c.

unlawful.[27]  This easement is therefore not illegal simply because Stevenson may have operated his business for a time without CIRI's authorization to use its lands.

We next turn to whether the easement violates public policy.  The Restatement provides examples of invalid servitudes violating public policy, including if they (1) "[are] arbitrary, spiteful, or capricious;" (2) "unreasonably burden[] a fundamental constitutional right;" (3) "impose[] an unreasonable restraint on alienation;" (4) "impose[] an unreasonable restraint on trade or competition;" or (5) "[are] unconscionable."[28]  Wayson does not show that the easement in question has any of these features, and we cannot hold that an easement giving access to lands that might subsequently be used as a jumping-off point to trespass on other lands is contrary to public policy.  There are less drastic remedies for trespass — for instance, owners of lands trespassed upon can enforce their own rights — than completely invalidating an easement that may sometimes be used to trespass, especially when, as here, the threat of trespass has abated.

The easement is not void for illegality or as against public policy.

---

[27]      *See Gillmor v. Wright*, 850 P.2d 431, 438 (Utah 1993) ("[T]he correct inquiry [in determining whether an easement is for a proper use] is not the legality of the activity conducted on the property reached by the easement or right-of-way, but rather whether a greater burden is imposed on the servient estate."); *Clinger v. Hartshorn*, 89 P.3d 462, 468 (Colo. App. 2003) (noting that whether historical users of easement had proper commercial guide and outfitting licenses was "not a proper subject of inquiry when determining permissible uses under an access easement").

[28]      RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 3.1; *see also id.* cmt. f ("Instead of attempting to limit allowable servitudes to those that are unlikely to pose threats to the general welfare, or to those where the threat can be avoided by applying established rules against restraints on alienation and competition, or attempting to anticipate all the servitudes that might threaten the social harm, this section states the overarching principle that lies behind all the particular rules that invalidate servitudes and other property arrangements because of the risks they pose to the general welfare.").

### 3. Marginal changes to the width of the road resulting from reasonably necessary road maintenance are permitted by the easement.

The superior court determined that Stevenson has the right to "incidental[ly]" widen the easement while maintaining the road. The court found both that the width of the easement is that reasonably necessary for enjoyment of the servitude, and that the scope of the easement includes reasonable maintenance. The court next found that the methods Stevenson employs to maintain the easement road — including using a road grader to smooth the surface, plowing snow and other debris off the side of the road, and pushing rocks over the downhill side of the road — are reasonable and necessary to his enjoyment of the easement.

Wayson contests these conclusions, arguing that Stevenson's maintenance activities are impermissibly widening the road and risking damage to Wayson's property. To address Wayson's arguments, we ask whether (1) the deed controls the easement's width,[29] and (2) Stevenson's maintenance activities are reasonably necessary and do not unreasonably interfere with Wayson's property.[30]

---

[29] *Andersen v. Edwards*, 625 P.2d 282, 286 (Alaska 1981) ("The law appears to be settled that where the width, length and location of an easement for ingress and egress have been expressly set forth in the instrument the easement is specific and definite." (quoting *Aladdin Petrol. Corp. v. Gold Crown Props.*, 561 P.2d 818, 822 (Kan. 1977))).

[30] *Id.* ("If . . . the width, length and location of an easement for ingress and egress are not fixed by the terms of the grant or reservation the dominant estate is ordinarily entitled to a way of such width, length and location as is sufficient to afford necessary or reasonable ingress and egress." (quoting *Aladdin Petrol. Corp.*, 561 P.2d at 822)); *see also* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.8(2) ("The dimensions [of a servitude] are those reasonably necessary for enjoyment of the servitude.").

### a.    The width of the easement is not specific and definite.

Wayson's argument raises the initial question of whether the width of the easement is determined by the deed.  If the deed does establish a precise width, widening the easement is not permitted.

"[W]here the width, length and location of an easement for ingress and egress have been expressly set forth in the instrument the easement is specific and definite," and its terms control.[31]  In *Labrenz v. Burnett*, for example, we held that a subdivision map "unambiguously describe[d]" a "thirty-foot" driveway easement that a property owner had over his neighbors' land.[32]

In contrast, the width of Stevenson's easement is not expressly set forth in the instrument.  The 1977 deed refers to the location of the easement — the existing roadway — but does not contain any numerical dimensions.  Moreover, the fact that the existing roadway had a specific width at the time the deed was executed does not mean that the parties intended the easement to always remain strictly the same width.[33]  Although Wayson contends that language in the deed, such as the terms "presently situated and constructed" and "existing roadway," specifies the precise dimensions of the easement, this argument is unpersuasive.

Nor are we persuaded by Wayson's argument that the superior court should have determined a specific width for the easement by relying on preliminary plats from

---

[31]    *Id.* (quoting *Aladdin Petrol. Corp.*, 561 P.2d at 822).

[32]    218 P.3d 993, 1000 (Alaska 2009).

[33]    *Cf. Andersen*, 625 P.2d at 284, 287 (holding that contract reserving "a 100 foot right-of-way" was "ambiguous as to whether it refers 'to the width of the way, or is merely descriptive of the property over which the grantee may have such a way as may be reasonably necessary' " (quoting *Hyland v. Fonda*, 129 A.2d 899, 904 (N.J. Super. Ct. App. Div. 1957))).

the archives of an engineering firm commissioned by Jack in 1978. Even if the plats specified the width of the road at the time they were drawn — the year after the 1977 easement was granted — they provide no insight into the width intended by the parties. Vernon himself testified that, even if the road was mostly one lane at the time of the deed, there was no intended width.

Where a contract is silent on an issue, a court may supply reasonable terms to fulfill the parties' expectations."[34] Accordingly, the court did not err by ruling that the easement does not have a precise width and that the width of the roadway is that reasonably necessary for the enjoyment of the easement.

> **b.      Stevenson's maintenance activities are reasonably necessary and do not interfere with Wayson's property.**

Because the width of the easement is not fixed by the deed, we must examine whether Stevenson's maintenance activities — which have allegedly widened the road over time — make use of Wayson's property in a way that "is reasonable for enjoyment of the servitude."[35] We must also examine whether the maintenance activities unreasonably interfere with Wayson's property.[36] Whether the widening of the easement is reasonably necessary or constitutes unreasonable interference with the enjoyment of Wayson's servient estate are discretionary determinations that we review for abuse of discretion.[37]

---

[34]     *Ellingstad v. State, Dep't of Nat. Res.*, 979 P.2d 1000, 1008 (Alaska 1999).

[35]     *Price v. Eastham*, 254 P.3d 1121, 1129 (Alaska 2011) (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.13 cmt. b).

[36]     *Id.* (citing RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.13 cmt. b).

[37]     *See Sykes v. Lawless*, 474 P.3d 636, 645 (Alaska 2020) ("We must decide
(continued...)

As an initial matter, we see no clear error in the superior court's factual findings that Wayson's property had not been damaged by Stevenson's maintenance activities, including grading and compacting the road and plowing snow and other debris off the side of the road.[38] The superior court noted that "Wayson presented no testimony to show that . . . his property . . . was damaged by [Stevenson] shoving the dirt, gravel, rocks, snow and ice over the edge of the road and onto the downhill slope." Wayson does not challenge this factual finding on appeal.

Based on these uncontroverted factual findings, the superior court did not abuse its discretion by determining that any "[i]ncidental widening of the road" from Stevenson's maintenance activities is reasonably necessary. Testimony at trial indicated that Stevenson's maintenance activities are consistent with standard maintenance practices for similar roads. Stevenson testified that during maintenance, materials get pushed over the side. He insisted, however, that any incidental widening of the road is so incremental that it is "[n]ot enough to even measure." He also noted that after a rainstorm the road is "narrower than it will be after you do it once the material settles." A civil engineer from the consulting company that created the preliminary plats corroborated Stevenson's testimony, indicating that the width of the road will vary due to maintenance activities. This testimony supports the superior court's determination that Stevenson's maintenance activities — and the resulting marginal increase in road width

---

[37]    (...continued)
whether the superior court abused its discretion by determining [the servient estate owner] could install two locked gates [over the access easement].").

[38]    "We review the superior court's factual findings for clear error, which occurs when a review of the entire record leaves us with a definite and firm conviction that a mistake has been made." *Offshore Sys.-Kenai v. State, Dep't of Transp. & Pub. Facilities*, 282 P.3d 348, 354 (Alaska 2012).

— are reasonably necessary. Stevenson may therefore perform this maintenance so long as he does not unreasonably interfere with Wayson's property.

And Wayson did not prove that unreasonable interference is occurring. "What constitutes unreasonable interference will depend largely on the circumstances, particularly the purpose for which the servitude was created and the use of the servient estate made or reasonably contemplated at the time the easement was created."[39] "The manner, frequency, and intensity of the use may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefitted by the servitude."[40] The only damage from Stevenson's maintenance activities that Wayson identified in his testimony is to the trees and brush on the side of the road. But the superior court found that because "trees and brush are routinely cut back along the edge of a roadway easement . . . such clearing or incidental damage is consistent with Stevenson's obligation to maintain the roadway." Wayson does not challenge the factual basis for this finding. Having no reason to doubt the factual basis for this finding, we conclude the superior court did not abuse its discretion by determining that Stevenson's maintenance activities do not unreasonably damage Wayson's property.

Because the superior court did not abuse its discretion by determining that the maintenance activities described are reasonably necessary and do not unreasonably interfere with Wayson's use of his property, any marginal widening resulting from these activities is permitted by the deed of easement.

---

[39] RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.10 cmt. h; *see also Labrenz v. Burnett*, 218 P.3d 993, 1000 n.17 (Alaska 2009) (citing comment h).

[40] RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.10.

### 4. The superior court did not clearly err by finding that Wayson interfered with Stevenson's use of the easement by posting a "No Glacier Access" sign.

The superior court concluded that posting a "No Glacier Access" sign interfered with Stevenson's right to reasonable use of the easement for ingress and egress. Wayson argues that the superior court erred in this finding because he posted the sign to avoid participating in Stevenson's use of the easement to "illegal[ly] . . . trespass" onto CIRI's lands. "Whether a particular activity by the servient owner constitutes an unreasonable interference is a question of fact"[41] that we review for clear error.[42]

Testimony from local residents at the preliminary injunction hearing supports the superior court's finding that "No Glacier Access" signs are "inherently confusing and [would] likely interfere with Stevenson's business operations." The Glacier View Community Council president testified that the sign was "damaging to [the community's] lodges and B&Bs and cafes and trailer parks" and was "not good for business." And a local store employee testified that visitors were inquiring about Wayson's "No Glacier Access" sign and that some people would leave despite being told that they could use the road to access the glacier. Because Stevenson has the right to use the easement for commercial purposes, we cannot say that the superior court clearly erred by finding this sign unreasonably interfered with Stevenson's use of the easement.

---

[41] JON W. BRUCE & JAMES W. ELY, JR., THE LAW OF EASEMENTS & LICENSES IN LAND § 8:21 (2021).

[42] *Offshore Sys.-Kenai*, 282 P.3d at 354 (citing *Labrenz*, 218 P.3d at 997).

**B.	The Superior Court Did Not Err In Addressing Wayson's Defamation Claims.**

**1.	The superior court did not err by dismissing Wayson's defamation claims arising from Stevenson's complaint on the basis of absolute privilege.**

Stevenson's complaint for declaratory relief against Wayson alleged that Wayson had interfered with the easement in various ways, including by appearing nude near the easement.  Wayson counterclaimed for defamation based on the public nudity allegation.

The superior court ruled Stevenson's public nudity allegation to be privileged and dismissed Wayson's defamation claim on summary judgment.  The court determined that the allegedly defamatory statement was protected by absolute privilege because Stevenson made the statement "solely within th[e] judicial proceeding" and the statement was "reasonably related to Stevenson's underlying easement claim."[43]

Wayson argues that the superior court erred by granting the absolute privilege to Stevenson and his attorneys with regard to the defamatory statements they made about Wayson.  Most of Wayson's arguments pertain to what he views as "terroristic threats" by Stevenson made to "incite fear and . . . violence" against Wayson.

---

[43]	An attorney or party to a judicial proceeding is "absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding" as a part of a judicial proceeding the attorney or party is participating in, "if the matter has some relation to the proceeding."  RESTATEMENT (SECOND) OF TORTS §§ 586-87 (AM. L. INST. 1977); *see also id.* § 586 cmt. a ("The privilege stated in this Section is based upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients. Therefore the privilege is absolute.").  We have previously recognized this privilege. *See Zamarello v. Yale*, 514 P.2d 228, 230-31 (Alaska 1973) (holding that party to property dispute was immune from suit for slander or disparagement of title when party filed quitclaim deed that had "direct relation to [the] claim of an interest in the property").

But although the superior court ruled that Stevenson's public nudity allegation was protected by absolute privilege, it did not dismiss Wayson's arguments about Stevenson's "threats" under the same rationale. Instead, as explained below, it rejected as untimely the post-trial motion in which Wayson brought these allegations to the court's attention.

Beyond this, Wayson essentially argues that the absolute privilege is unconstitutional because it violates equal protection.[44] He appears to maintain that the privilege allows lawyers to engage in extortionate behavior while being shielded from consequences. This argument is unpersuasive for two reasons. First, all participants in the legal process — not only lawyers — may claim the absolute privilege.[45] The absolute privilege does not implicate the equal protection guarantee because no individuals receive unequal treatment.[46] Second, the absolute privilege is not a complete shield against responsibility for allegations in legal pleadings. Lawyers are responsible under Alaska Civil Rule 11(b) for any unfounded allegations they make and may be disciplined with monetary or other sanctions.[47]

---

[44]     Alaska Const. art. I, § 1 (providing that "all persons are equal and entitled to equal rights, opportunities, and protection under the law").

[45]     *Lawson v. Helmer*, 77 P.3d 724, 727-28 (Alaska 2003).

[46]     *See Planned Parenthood of the Great Nw. v. State*, 375 P.3d 1122, 1135 (Alaska 2016) (explaining that the equal protection guarantee applies to people similarly situated who are treated differently).

[47]     *See Kollander v. Kollander*, 400 P.3d 91, 96 (Alaska 2017) ("To comport with Rule 11 'an attorney is obliged to make objectively reasonable efforts to ascertain the facts of the case before making assertions of fact in court documents.' " (quoting *Copeland v. State*, 70 P.3d 1118, 1122 (Alaska App. 2003))); *see also* Alaska R. Civ. P. 95 (authorizing courts to impose fines or assess costs or attorney's fees upon attorneys "for failure to comply with [the civil] rules").

Wayson fails to show that the absolute privilege violates equal protection.

**2. Wayson's defamation claims based on the police report are not at issue in this appeal.**

In a post-trial motion regarding the easement's width, Wayson alleged that Stevenson made false statements to a police officer. Wayson claimed that Stevenson made knowingly false statements that Wayson was threatening him with "violent action" and exhibiting increasingly unstable and violent behavior indicating that Wayson "was about to commit a crime." According to Wayson, Stevenson made these statements to supply a "justification" in a purported plot to shoot Wayson.

Wayson appears to contend that his discussion of these alleged statements amounted to new claims of defamation against Stevenson and that the superior court rejected these claims as absolutely privileged, as it did in dismissing Wayson's initial defamation claim.[48] But the superior court instead rejected Wayson's post-trial motion, which it correctly characterized as a motion for reconsideration, as untimely. This was not an abuse of discretion; Wayson did not file his motion within ten days of the court's amended findings of fact and conclusions of law.[49] Wayson does not challenge that ruling. Whether Stevenson's statements to the police were defamatory therefore is not at issue in this appeal.

**C. Wayson's Clean Water Act Argument Is Waived.**

Wayson argues that the superior court's ruling that Stevenson may maintain the road effectively authorizes Stevenson to dump pollutants into the Matanuska River

---

[48] Wayson's filings with the superior court did not request leave to amend his counterclaims to add a new defamation claim based on these asserted threats. Instead he asked the superior court to order a criminal investigation into Stevenson's conduct.

[49] Alaska R. Civ. P. 77(k); *Baseden v. State*, 174 P.3d 233, 243 (Alaska 2008) (holding superior court did not err in treating motion filed 19 days after ruling as untimely).

without a permit, in violation of the federal Clean Water Act.[50]  But Wayson's briefing does not indicate that a Clean Water Act claim was raised or addressed at trial.  His sole reference to the Act is to an Alaska Department of Environmental Conservation publication pertaining to snow disposal that does not appear to have been admitted as an exhibit.  Because no claims based on the Clean Water Act appear to have been litigated at trial, we conclude that Wayson's argument is waived.[51]

**D.     The Superior Court Did Not Abuse Its Discretion By Awarding Stevenson $50,000 In Attorney's Fees.**

Wayson's final argument challenges four aspects of the superior court's attorney's fees decision:  (1) its refusal to award him attorney's fees; (2) its award of attorney's fees to Stevenson when Wayson alleged Stevenson's attorneys submitted fraudulent billings; (3) its ruling that Stevenson prevailed on the defamation issue; and (4) its ruling that Stevenson prevailed on main issues of the case.

Attorney's fees are governed by Alaska Civil Rule 82, which permits the superior court to award attorney's fees to the "prevailing party."[52]  "[T]he prevailing party is the one who has successfully prosecuted or defended against the action, the one who is successful on the main issue of the action and in whose favor the decision or verdict is rendered and the judgment entered."[53]  "A prevailing party need not have

---

[50]     33 U.S.C. §§ 1251-1389.

[51]     *Mullins v. Oates*, 179 P.3d 930, 941 n.31 (Alaska 2008) ("[A] party may not raise an issue for the first time on appeal." (quoting *Brandon v. Corr. Corp. of Am.*, 28 P.3d 269, 280 (Alaska 2001))).

[52]     *See* Alaska R. Civ. P. 82(a) ("Except as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule.").

[53]     *BP Pipelines (Alaska) Inc. v. State, Dep't of Revenue*, 327 P.3d 185, 191
(continued...)

received all the relief requested, and a party who recovers on only one of several claims may still be the prevailing party."[54]

"[B]oth the determination of prevailing party status and the award of costs and fees are committed to the broad discretion of the [superior] court."[55] We review the superior court's fee award and determination of which party prevailed for abuse of discretion, vacating the award or determination "only when it is manifestly unreasonable."[56]

### 1. The superior court did not abuse its discretion by deciding that Stevenson prevailed on main issues of the case and was therefore entitled to attorney's fees.

Wayson first disputes the superior court's award of attorney's fees to Stevenson by asserting that he, not Stevenson, prevailed on the main issues in the litigation, which he describes as: (1) whether the sign constituted interference with the easement; (2) the defamation claim; and (3) his counterclaim involving the vehicle commercial. He also asserts he is the prevailing party on the issues he is appealing.

---

[53]     (...continued)
(Alaska 2014) (quoting *Schultz v. Wells Fargo Bank, N.A.*, 301 P.3d 1237, 1242 (Alaska 2013)).

[54]     *Id.* (footnote omitted).

[55]     *Schultz*, 301 P.3d at 1241 (quoting *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 721 (Alaska 2003)).

[56]     *Boiko v. Kapolchok*, 426 P.3d 868, 876 (Alaska 2018) (quoting *Cizek v. Concerned Citizens of Eagle River Valley, Inc.*, 71 P.3d 845, 848 (Alaska 2003)); *Schultz v. Wells Fargo Bank*, 301 P.3d at 1241; *BP Pipelines (Alaska) Inc.*, 327 P.3d at 189 (quoting *State v. Jacob*, 214 P.3d 353, 358 (Alaska 2009)).

To determine the prevailing party, the court must evaluate whether the party obtained the relief sought.[57] The superior court broke the case down into three segments for purposes of prevailing party status: (1) the preliminary injunction; (2) the defamation claims; and (3) the easement. It concluded that Stevenson was the prevailing party in all three categories.

This conclusion is not an abuse of discretion. As the superior court noted, this litigation began because Wayson put a "No Glacier Access" sign at the top of the easement road, leading to Stevenson's lawsuit. The preliminary injunction hearing followed. Although the court heard no evidence that Wayson had interfered with the easement by appearing nude in public, it did ultimately grant in part Stevenson's request for a preliminary injunction. Wayson was ordered to remove the sign.[58] The court did not abuse its discretion by determining that Stevenson was the prevailing party in this stage of the litigation.

Stevenson was also the prevailing party on the defamation issue. Wayson claims that when the court granted Stevenson's motion for a preliminary injunction it found that he had not been publicly nude at any time on his deck or property, meaning that Stevenson's statement in his complaint to that effect was false. As a result, Wayson argues, he was the prevailing party on the defamation issue. But Wayson's argument overlooks the legal rulings on his defamation claims. The superior court observed that most of the litigation was related to Wayson's claims of defamation. It noted that there

_____

[57]    *Schultz*, 301 P.3d at 1242.

[58]    The court noted that Wayson was "perfectly within his right to put up [alternative] signs" containing messages that warn others of "the road's inherent risks to motorist(s)," such as "Dangerous Road. Enter at Own Risk, You Might Be Killed." But because the court's ruling required Wayson to remove the only sign he had actually erected, we do not view the court's comments about permissible signage as inconsistent with the conclusion that Stevenson obtained the relief he sought.

were at least seven substantive motions addressed to Wayson's claim for defamation. Yet the only point on which he prevailed was that he was permitted to file a third-party complaint against Stevenson's lawyer for defamation — a claim that was later dismissed in federal court.

In addition, the superior court correctly noted that the defamation claims were addressed only as a matter of law, not fact. Although Stevenson produced no evidence to support the public nudity allegation and it is understandable that Wayson might feel that he refuted an unfounded allegation, Stevenson prevailed on legal grounds. Stevenson had absolute privilege to make the allegedly defamatory statements during litigation, and Wayson's claims were consequently dismissed. For these reasons, it was not an abuse of discretion to conclude that Stevenson was "the one who [was] successful on [this] main issue of the action and in whose favor the decision . . . [was] rendered and the judgment entered."[59]

Wayson did prevail on a few issues pertaining to the easement: He obtained rulings that he had not interfered with the easement except by posting a "No Glacier Access" sign; that using the easement road for the vehicle commercial was beyond the scope of the easement; and that Stevenson was obligated to maintain liability insurance protecting Wayson from potential liability caused by Stevenson's operations. But Stevenson still prevailed on the majority of issues regarding the easement. For example, the superior court ruled that he may use the easement for commercial purposes and without restriction; that the scope of the easement includes his maintenance activities; that his use of the easement does not constitute trespass; and that he need not use Keith's Road to access his commercial business operations.

---

[59]     *BP Pipelines (Alaska) Inc.*, 327 P.3d at 191 (quoting *Schultz*, 301 P.3d at 1241).

Because Stevenson prevailed on the main issues and on the majority of issues in the case,[60] we conclude that the superior court did not abuse its discretion by granting Stevenson prevailing party status and awarding him attorney's fees.

## 2. The superior court did not abuse its discretion by awarding attorney's fees to Stevenson's attorneys despite Wayson's allegation of fraudulent billings.

Wayson next argues that it was an abuse of discretion for the superior court to award attorney's fees because one of Stevenson's attorneys allegedly defrauded an insurance company and submitted fraudulent billings in the litigation against Wayson. He seems to suggest that in light of these allegations, the superior court should have stayed the case and referred Stevenson's attorney to the authorities for investigation of fraudulent billings.[61] We disagree. The superior court correctly noted that it has no role in directing prosecutions. It is not an abuse of discretion for the superior court to decline to exercise powers it does not have.

We also reject Wayson's argument to the extent that he means certain billings should have been disallowed. The superior court ruled that Wayson's objections to specific entries were inadequately briefed; Wayson does not challenge that ruling.

---

[60] *See id.* ("A prevailing party need not have received all the relief requested, and a party who recovers on only one of several claims may still be the prevailing party." (footnote omitted)).

[61] Wayson previously sought an order from this court for the criminal investigation of the attorney for perjury and theft by deception. We denied Wayson's request and instructed him to instead file a new appeal of final orders issued by the superior court.

Wayson provides no record citations to support this argument and fails to present the argument in coherent form; thus, it is waived for inadequate briefing.[62]

###    3.    Because Wayson is not the prevailing party, his argument that the Alaska Constitution requires an award of attorney's fees to him is moot.

Wayson contends that the superior court's failure to award him attorney's fees and costs is unconstitutional because it violates his "equal right to 'the rewards' of defending himself in court" under Article I of the Alaska Constitution. "An issue 'is moot where a decision on the issue is no longer relevant to resolving the litigation.' "[63] Because we affirm the superior court's ruling that Stevenson was the prevailing party and therefore entitled to attorney's fees, the resolution of this issue "would not result in any actual relief" even if Wayson prevailed.[64] Consequently, though we have repeatedly rejected the claim that non-attorney pro se litigants may collect attorney's fees,[65] we need not decide whether the superior court violated Wayson's constitutional rights by denying him recovery of attorney's fees and costs.

As a final note, we observe that the superior court's fee award dispels Wayson's suggestion that the court was biased against him. The court varied the fee

---

[62]    *Coppe v. Bleicher*, 318 P.3d 369, 378-79 (Alaska 2014) (upholding determination that certain issues were waived because argument "lacked citation to authority or a legal theory to support it"); *see also Hagen v. Strobel*, 353 P.3d 799, 805 (Alaska 2015) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal." (quoting *Glover v. Ranney*, 314 P.3d 535, 545 (Alaska 2013))).

[63]    *Long v. Arnold*, 386 P.3d 1217, 1223 (Alaska 2016) (quoting *Maness v. Daily*, 184 P.3d 1, 8 (Alaska 2008)).

[64]    *Alaska Ctr. for the Env't v. Rue*, 95 P.3d 924, 929 (Alaska 2004).

[65]    *E.g.*, *Alaska Fed. Sav. & Loan Ass'n of Juneau v. Bernhardt*, 794 P.2d 579, 581-82 (Alaska 1990); *Shearer v. Mundt*, 36 P.3d 1196, 1198 (Alaska 2001).

award to Stevenson's counsel downward to 22% from the standard 30% for submitting "inefficient" filings to the court and engaging in "unprofessional" behavior.[66]  We see no evidence that the court treated Wayson unfairly at any point during the proceedings.

## V.  CONCLUSION

We AFFIRM the judgment of the superior court.

---

[66]  Alaska R. Civ. P. 82(b)(3) ("The [superior] court may vary an attorney's fee award calculated under . . . this rule if, upon consideration of the factors listed below," including "the attorneys' efforts to minimize fees" and "vexatious or bad faith conduct," the court "determines a variation is warranted.").